ILLINOIS TRUST & SAVINGS BANK, Administrator, Respondent, vs. ALEXANDER STEWART LUMBER COMPANY, Appellant.

*April 17—September 29, 1903*

(1) *Amendment of pleading: Withdrawing admission: Discretion.*
(2–9) *Chattel mortgages: Title of parties: Conversion: Sale by mortgagor: Rights of vendee: Subrogation: Application of payments: Confusion of goods.*

1. A question having arisen between the vendee of a chattel mortgagor and the latter's mortgagee as to whether proceeds of the mortgaged property in his hands are subject to the lien of the mortgage, and if so to what extent, and the mortgagee having brought suit to vindicate his claim in that regard,

charging such vendee with liability for money had and received to the amount unpaid upon the mortgage indebtedness, and sometime before suit brought such vendee, upon the order of the mortgagor, having paid the mortgagee a sum of money ostensibly on account of such proceeds, and the parties having joined issue in the action in such form, as to admit that such payment was to apply on such mortgage indebtedness and that the matter in respect thereto was not and would not be a subject of dispute between them, and prior to the trial, which took place several years after the action was commenced and also after issue was joined, in the meantime the plaintiff and the mortgagee, the only person knowing the facts in regard to how the payment came to be applied to an unsecured indebtedness of the latter to the former, as it in fact was, without the consent of such vendee, having been examined under oath in respect to the issues made by the pleadings, the result being such as to confirm the defendant's opinion that there was no controversy and would be none as to such payment having been in fact made upon the mortgage indebtedness, and just prior to the trial the mortgagor, a material witness for the defendant in case of a change of attitude by the plaintiff in respect to whether such payment was made on such indebtedness, having died,—just before the trial was to be entered upon, upon a showing of all such facts, and further that plaintiff's concession as to such payment having been made on the mortgage indebtedness was made upon the faith of information obtained by his attorneys from a written statement furnished by defendant to the plaintiff, but without any claim that the latter was ignorant of the contents of his pleading at any time, the court permitted such pleading to be amended, withdrawing the admission and charging that the payment was made and money applied upon an indebtedness other than that secured by the mortgage: *Held*, while not deciding whether the court's ruling under the circumstances was prejudicial error, a determination thereof being omitted because of its not being vital to the appeal, that the question is one the solution of which in support of such ruling is a matter of serious difficulty.

2. A chattel mortgagee holds the legal title to property involved, qualified by the mortgagor's right to redeem the same at any time before he shall have made default and the property shall have been reduced to the former's possession.

3. A chattel mortgagor in possession is the general owner of the property involved, his ownership resting upon the equitable right to clothe himself with the full legal title.

4. The title of a mortgagee, though legal, is in fact special, in that till the right of redemption is extinguished his property interest is limited to the amount due upon the indebtedness.

5. While the general property of a chattel mortgagor in the chattels involved continues, he may sell or mortgage the same, conveying a good title thereto subject to the primary incumbrance.

6. While the title of a chattel mortgagee remains subject to the right of redemption, if the property involved be converted by the mortgagor or any one else having an equitable right to the same, subject to the mortgagee's special property therein, the measure of the former's recovery of damages is the amount due and unpaid upon the mortgage indebtedness.

7. A vendee of a chattel mortgagor upon being called upon to pay off the mortgage indebtedness, is entitled to have applied thereon all sums of money paid upon the same out of the proceeds of property covered by the mortgage, that has been converted into money, whether included in the sale to such vendee or not, and is entitled to be subrogated to the rights of the mortgagee in any other security he may have for the payment of the mortgage indebtedness, to save him from loss, there being no superior equities.

8. If the mortgagor of chattels without the consent of the mortgagee confuses the same with other property of the same character belonging to a third person, and the latter, by consent of such mortgagor, converts the common property into money knowing the facts, actually or constructively, such third person is liable to the mortgagee as for money had and received, but only to the extent of the sum due upon the mortgage indebtedness, he having a right to the benefit of all other mortgage security to save himself against loss, as before stated, there being no superior equity.

9. If in the event last mentioned the third person pays to the mortgagee a sum of money out of the proceeds of all or a part of the mortgaged property to apply upon the mortgage indebtedness, he is entitled to have the same applied thereon regardless of any agreement such mortgagee and the mortgagor may make to which he is not a party.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Marathon county: JAMES O'NEILL, Judge. *Reversed.*

The substance of the pleadings upon which the action was

tried, omitting formal allegations and those showing legal capacity to sue, was as follows:

*Complaint:* February 1, 1891, plaintiff was the owner and entitled to the legal possession of 1,700,000 feet, board measure, of pine lumber and a quantity of other products derived from the manufacture of pine saw logs located in the millyard of E. K. Buttrick, all being of the value of $15,500. On or about the last day of February, 1891, defendant converted all of such property to its own use and converted the same into money, receiving the full amount of said value, and retained the same. Thereupon plaintiff elected to hold defendant liable for said proceeds as and for money had and received by it for his use, and before the commencement of this action duly demanded payment of the same, which was refused.

*Answer:* March 31, 1890, defendant contracted with J. E. Kathan in effect as follows: The latter sold to the former the lumber, lath and shingles to be manufactured from 5,000,000 feet of logs of a specified mark for $7 per thousand feet piled in the millyard at the place of manufacture, and one half the excess thereof received upon a resale of the same, provided the circumstances would permit of the deal being closed out by January 1, 1891, otherwise the defendant agreed to pay Kathan interest on the value of the lumber at $7 per thousand feet until sold. The logs were manufactured into lumber and the products piled in the millyard as contemplated by such agreement, during the season of 1890, and defendant paid to Kathan $38,777.33. The latter superintended such operations, and after the sawing season was over he rendered to defendant a statement of the amount of products on hand, showing that there were 5,000,000 feet of the lumber, mill run, and a quantity of lath and shingles, besides some cull lumber, all piled in the millyard of E. K. Buttrick, at Rhinelander, Wisconsin. July 10, 1890, Kathan and wife mort-

gaged to Walter A. Scott the standing timber on certain lands and the saw logs that might be cut therefrom, it being stipulated in the mortgage that the timber should be cut from the lands, made into saw logs and the saw logs manufactured into lumber and the lumber piled at the place of manufacture and so marked as to identify the same as having been produced from said timber and as being covered by said mortgage. The mortgage was given to secure a loan of $10,000 and the interest thereon. It contained all the provisions usually inserted in chattel mortgages in respect to protecting the mortgagee's interest in the property after being converted into personalty, and the enforcing of the security in respect thereto. The instrument was duly executed so as to be entitled to record as a real-estate mortgage. The standing timber was cut, converted into lumber and other products, and the same were piled in the millyard as agreed upon as aforesaid. On the entire products made from all the logs involved in such transaction, there were 420,000 feet of lumber marked as mortgaged lumber. That and the manufactured products covered by the mortgage, made from the marked logs, up to the time of the sale of the lumber hereinafter mentioned, remained in the millyard under the control of Kathan by Scott's consent. He was authorized by Scott to sell the same at not less than $8.50 per thousand feet. January 22, 1891, under such authority, Kathan included all the mortgaged lumber with that involved in the deal between himself and defendant in a sale to the H. Whitbeck Company, the entire consideration to be paid to defendant. Scott was conversant with the transaction and acquiesced therein. January 22, 1891, there was a settlement between Scott and Kathan and the defendant, and the amount going to each out of the proceeds of the sale was ascertained, that to be paid to Kathan for Scott on account of the mortgaged lumber being adjusted at $6,428, which sum was paid, the money reaching the possession of defendant. At the close of the sawing season of

1890 there remained, covered by the mortgage, 300,000 to 400,000 feet of saw logs and 5,000,000 feet of timber, all being of a sufficient value to secure payment of the balance of the mortgage indebtedness. Scott in fact never had any interest in the lumber sold as aforesaid, except as to 420,000 feet piled by itself in the millyard and designated as mortgaged lumber.

The complaint and answer were both amended pleadings. The original complaint was served September 3, 1898, several years after the action was commenced. The original answer was served September 14, 1898. It was framed with reference to the allegations of the complaint, in effect admitting payment of $6,428 upon the mortgage indebtedness in February, 1891. The purpose of the amendment of the complaint was to withdraw such admission. The motion to do so was opposed and the ruling in favor of plaintiff excepted to. The facts brought to the attention of the court, upon which such ruling was based, in addition to those heretofore stated, are as follows: The admission in the complaint as to a payment having been made upon the mortgage indebtedness was embodied in the complaint wholly through ignorance of the attorney who drew it of the facts. He acquired a false impression in respect thereto which was not corrected till after the receipt of the amended answer. He was not informed by the plaintiff that any such payment had been made, but gained the impression to that effect from a statement of account made by defendant to plaintiff. In fact, no payment whatever upon any account was made in January, 1892. A payment of $6,428 was made February 1st, not on the indebtedness mentioned in the complaint, but on account of a written order given by Kathan upon the defendant to the plaintiff to apply on other indebtedness. Conclusive evidence of the facts as stated will be produced upon the trial. The action was commenced September 3, 1892. Service of the complaint was delayed by consent of the parties and in

view of a possible settlement till September 3, 1898. The,
case was not tried till some three years thereafter. During
all that time defendant's counsel supposed from the plead-
ings that there was no.controversy as to $6,428 having been
paid upon the mortgage indebtedness. They prepared for
trial of the cause with that view. In the meantime both
Kathan and Scott were examined, during which there was no
suggestion of any dispute as to payment having been made as
stated. During Scott's examination he testified to having re-
ceived $6,428 in answer to questions plainly indicating that
they had reference to a payment upon the mortgage indebted-
ness. He said he received the same in February, 1891, and
that he received it upon the Kathan order. Kathan died a
few days before the trial. In the meantime there had been a
change of venue. Immediately after the death of Kathan,
May 6, 1901, plaintiff's attorneys notified defendant's attor-
neys of their desire to amend the complaint by withdrawing
the admission that $6,428 was paid upon the mortgage in-
debtedness. When the case was finally brought on for trial,
June 24, 1901, with all such facts before the court, plaintiff
was allowed to amend the complaint as desired.

The cause was tried by the court. According to the de-
cision filed the evidence was to the following effect: During
the season of 1890, 4,722,960 feet of pine saw logs were
manufactured at E. K. Buttrick's sawmill in Rhinelander,
Wisconsin, the products thereof consisting of about 5,650,000
feet of merchantable lumber, mill run, including lath and
shingles reduced to a lumber equivalent, being, under the di-
rection of J. E. Kathan, by consent or agreement of all par-
ties interested, piled in Mr. Buttrick's millyard, where the
same remained until sold as hereinafter mentioned. The
title to 3,324,880 feet of such logs, under the contract be-
tween defendant and Kathan mentioned in the pleadings,
was in defendant. The title to the balance of the logs,
1,498,080 feet, was in Kathan, subject to the Scott mortgage

mentioned in the pleadings. The marks on the mortgaged logs were not recorded in the district where the same were cut and manufactured. The mortgage was filed in the office of the proper city clerk and duly recorded in the office of the proper register of deeds, and a copy thereof was filed in the office of the lumber inspector of said district, but the same was not recorded. Defendant had notice of the existence of such mortgage. It provided that the products of the Scott logs should be piled separately from the products of any other logs and should be so marked as to indicate that they were covered by such mortgage. The title to all the other lumber was in the defendant under its contract with Kathan. Defendant was bound by its contract to pay Kathan for said other logs a sum equal to $7 per thousand feet for the merchantable lumber made therefrom, ninety cents per thousand for the lath, and $1.25 per thousand for the shingles of certain specified grades, and the cost of manufacturing the culls, by the time agreed upon if the lumber was then sold, and if not then sold with interest thereon at the rate of eight per cent. per annum from such time till the same should be sold, and also to pay him one half of the excess received from the lumber over such amount. Kathan, without knowledge or consent of Scott but with the knowledge of defendant, neglected to follow the stipulations of the mortgage by having the products of the mortgaged logs piled separately from all others. Whereas there were 1,656,724 feet of such products, there were piled as stipulated in the mortgage but 420,000 feet. The rest of such products were intermixed and piled with those from defendant's logs. Scott did not know thereof till after the lumber was sold and he had received a portion of the proceeds as hereinafter mentioned in the belief that 420,000 feet of lumber represented all the products of the mortgaged logs. He consented to the sale thereof by Kathan and defendant with the other lumber, on condition that an amount equal to $8.50 per thousand feet

62        SUPREME COURT OF WISCONSIN.        [Sept.

Illinois T. & S. Bank v. Alex. Stewart L. Co. 119 Wis. 54.

on 420,000 feet, of the proceeds of the sale, should be paid
to him.   Some time prior to the sale Kathan gave Scott an
order on defendant for any sum that might be found payable
by the latter to Kathan on the log and lumber deal between
them, and such order was deposited with the defendant and
was honored as hereinafter stated.   All the lumber in the
millyard was sold by the defendant and Kathan January 22,
1891, and the proceeds thereof, February 9th thereafter,
came to the possession of defendant, such amount being
$49,026.83.   The element included therein representing the
mortgaged logs was $14,082.14.   Shortly after such sale
there was a settlement between defendant and Kathan in
which it was determined that, after applying so much of said
proceeds as were necessary to balance the payments made to
the latter upon the log and lumber deal and the one-half to
which defendant was entitled, there was left going to Kathan
$6,428.   A draft for that amount was sent to Scott.   He re-
ceived the same and by agreement with Kathan, but without
the knowledge or consent of defendant, applied the money,
first in discharge of a claim of $5,049.98 he had against
Kathan for money loaned him and used in his logging opera-
tions, and $1,330 upon the mortgage indebtedness.   Scott
still held under his mortgage timber and logs out of which
he realized, March 2, 1892, $3,745 and August 2d thereafter
$197.80.   After applying such amounts upon the mortgage
indebtedness there is left due Scott thereon $6,028.87 with
interest on such sum from August 2, 1892, at the rate of
eight per cent. per annum.   Soon after the payment was
made as aforesaid Scott complained to defendant that he had
not received the amount out of the proceeds of the lumber to
which he was entitled.   There was never any settlement be-
tween Scott and Kathan or defendant in regard to the afore-
said claim, but defendant never acquired any interest what-
ever in the mortgaged logs or lumber.   Defendant knew, when

it participated in the sale of the lumber and received and
appropriated the proceeds thereof, of the rights of Scott.

Upon such facts and others not necessary to mention it
was held as a matter of law that Scott was entitled to hold
defendant liable for money had and received, in a sufficient
sum to discharge the balance due upon his mortgage indebt-
edness, and judgment was rendered accordingly.

The defendant appealed from the judgment. Afterwards,
in this court, upon suggestion of the death of the plaintiff,
the cause was revived in the name of the *Illinois Trust &
Savings Bank,* as administrator of his estate.

For the appellant there was a brief by *Hurley & Jones,*
attorneys, and *H. H. Hayden,* of counsel, and a reply brief
by *Hurley & Jones,* attorneys, and *M. B. Rosenberry,* of coun-
sel; and the cause was argued orally by *M. B. Rosenberry*
and *M. A. Hurley.*

For, the respondent there were separate briefs by *Curtis
& Reid* and *Greene, Fairchild, North & Parker,* and oral
argument by *A. H. Reid* and *Geo. G. Greene.*

The following opinion was filed May 8, 1903:

MARSHALL, J.    Error is assigned because the trial court
permitted the complaint to be amended, withdrawing the ad-
mission that the $6,428 paid Scott by appellant was on ac-
count of the mortgage indebtedness. In our view that is im-
material.    We will say, however, that whether the amend-
ment was proper or not admits of serious doubt.    The admis-
sion stood upon the record for years.    The attitude of Mr.
Scott and his attorney during that time did not furnish any
ground for even a suspicion that it would be claimed upon
the trial that the payment was not made on account of the
mortgage indebtedness or that it was not in fact so applied.
In the meantime he and Kathan were examined under oath,
the latter twice. Of course they would have been interrogated

particularly on the subject of such payment if it had been
thought by respondent's counsel that there was or would be
any dispute about that matter. Such examinations not only
did not suggest the existence or probability of such dispute,
but were well calculated to support the view that the truth of
the matter was as suggested in the complaint. At the last
moment, and upon the happening of the occurrence which
rendered it impossible for appellant to know from the mouth
of Kathan what occurred between him and Scott at the time
the latter applied the $6,428 upon the unsecured debt, the
latter was permitted to entirely change his attitude,—to
make such change in face of the obvious situation that, since,
when he received the money, he had yet a large amount of
security for the $10,000 loan independently of any claim
upon appellant, it was perfectly natural and competent for
an arrangement to be made between him and Kathan to
apply the payment upon the unsecured indebtedness, though
made by appellant on account of the mortgage indebtedness,
and to at the same time recognize the latter's right to have
the same, as to it, regarded as at least a *pro tanto* discharge
of the lien upon the fund produced by the sale of the mort-
gaged property, and that the death of Kathan rendered it im-
possible for appellant to meet the new situation presented by
the amendment, was, to say the least, a great stretch of judi-
cial discretion, notwithstanding the broad field within which
such discretion is permitted to operate as held in the decis-
ions of this court. *Post v. Campbell,* 110 Wis. 378, 85 N. W.
1032; *Gates v. Paul,* 117 Wis. 170, 94 N. W. 55.

There appears to be some difference of opinion between the
learned counsel who presented here respondent's side of the
case. On the one hand counsel take the position that appel-
lant never acquired any interest whatever in the mortgaged
lumber or logs or the proceeds thereof. The learned court
adopted that view and held that the payment of the $6,428
left appellant still liable, since, as claimed by respondent, the

mortgaged lumber produced over $14,000, regardless of whether such payment was out of such proceeds or not; while other counsel freely admit that if such payment was in fact made out of such proceeds, so far as appellant was concerned, it could not have been properly applied without its consent to any unsecured indebtedness of Kathan to Scott. We will consider the case from both such aspects.

It seems that the finding that appellant never obtained any interest whatever in the mortgaged property or the fund received therefrom is manifestly wrong. It is elementary that a mortgagee of chattel property holds the legal title thereto, but nevertheless, till default and actual possession of the property in himself, his interest, as against the mortgagor or any person claiming under him, is special. It is limited to the amount of the mortgage indebtedness. The general property and the equitable title being in the mortgagor or those claiming under him, the mortgagor may sell the mortgaged property and convey a good title thereto subject to the mortgage. Such title is equitable in character, to be sure, but it is of sufficient dignity to be regarded as a general property right, good as against the whole world except as to the special interest of the mortgagee, which, till it becomes absolute, may be extinguished by the owner of the general property by payment of the mortgage indebtedness. In case of a conversion of the property as to the mortgagee, the measure of damages recoverable by him is limited to the value of his special interest therein, the amount due upon the mortgage. *Smith v. Konst,* 50 Wis. 360, 7 N. W. 293. The mortgagor may not only sell the property and convey a good title subject to the mortgage, but he may place a second mortgage thereon, and the subsequent vendee or mortgagee may protect his interest and clothe himself with a full legal title by paying off the first incumbrance. *Smith v. Coolbaugh,* 21 Wis. 427. It follows necessarily that the conduct of Kathan in mixing the mortgaged lumber with appellant's lumber and

treating all of it substantially as products coming under his
contract with appellant, and the treatment by appellant, with
knowledge of the facts, of the lumber so confused, substan-
tially as legitimately under such contract, vested in it an in-
terest therein and in the proceeds thereof good as against the
whole world except Scott under his mortgage. It was com-
petent for it at any time to extinguish the mortgage by pay-
ing the amount due thereon. If Scott had brought suit
against appellant before receiving the $6,428, the limit of
his recovery on account of the fund derived from the mort-
gaged lumber would have been, necessarily, the amount re-
ceived from such lumber upon the sale to Whitbeck. & Co.,
not exceeding the amount due upon the mortgage indebted-
ness. It follows that if the $6,428 was paid to Scott on ac-
count of such fund and by reason of Scott's interest therein,
his remaining interest was that much less than before.

Whether the $6,428 was in fact paid out of the proceeds
of the mortgaged lumber we are not informed by any specific
finding made by the trial court. The idea apparently em-
bodied in the findings is that the payment was made out of
profits due Kathan growing out of the execution of the con-
tract between him and appellant of March 31, 1890, and that
as such contract did not cover the mortgaged logs appellant
cannot legitimately refer to such logs or the products manu-
factured therefrom as the origin of the fund out of which the
payment was made. We are unable to find in the evidence
legitimate support for that view. The findings pretty clearly
show, and the evidence leaves no reasonable doubt on the
question, that Kathan, who had, as we have seen, the general
property right to the mortgaged logs and lumber, treated such
lumber, with appellant's consent, as he treated all other logs
owned by him which came into the Buttrick mill boom dur-
ing the sawing season of 1890. No discrimination was made
between the lumber from the different kinds of logs, except
as to about 420,000 feet of lumber, which was piled by itself

and marked as Scott lumber in conformity with the requirements of the mortgage. All the logs were manufactured together. The lumber was all piled and treated as appellant's. The entire stock was so treated in the sale to Whitbeck & Co. The proceeds of the sale came to the hands of appellant as contemplated in the contract of March 31, 1890, and were accounted for to Kathan according to the evident understanding between the parties. Nevertheless, as we have seen, the learned trial court found that appellant never obtained any interest whatever in the mortgaged logs or lumber, and therefore never obtained any title or interest in the fund produced therefrom. Upon that theory the case passed to judgment,— upon the theory that the entire proceeds of the mortgaged property, $14,082.15, was received by appellant to the use of Scott, regardless of what was in fact due upon the mortgage indebtedness; that his interest in the mortgaged property and the fund derived therefrom was absolute, whereas it was only special and limited, as we have seen.

As stated before, substantially all the logs, in manufacturing the same into lumber and preparing the products for sale, and the equivalent thereof in money after the sale, were treated as covered by the contract between appellant and Kathan. The lumber, in the main, was piled in the Buttrick millyard so as to confuse beyond identification that produced from the mortgaged logs with that produced from the unmortgaged logs, and specifically described in the contract of March 31, 1890. All payments made to Kathan, including the $6,428, were charged to him on appellant's books. When the settlement was made between the parties the proceeds of the entire stock of lumber were treated as a single fund under the contract of March 31, 1890. It was all credited to Kathan and the profit going to appellant was charged to him. While there is some little confusion in the evidence of the witness who made up the account between the parties for closing, as regards whether the terms of the contract were liter-

68        SUPREME COURT OF WISCONSIN.        [Sept.

Illinois T. & S. Bank v. Alex. Stewart L. Co. 119 Wis. 54.

ally followed or not, he testified very clearly that it was
his understanding that the lumber was to be all credited to
Kathan at the price agreed upon in such contract, and the
result shows clearly, in our judgment, that it was so credited.
The statement of the settlement under the contract, which was
introduced in evidence, and the result transferred to appel-
lant's books, do not show with exactness that the profits of the
lumber deal were worked out by taking account of all of the
lumber as if it were included in the contract referred to; but
from all the figures it seems that no rational conclusion can
be arrived at other than that the property and the fund de-
rived therefrom were so treated. It is not to be wondered at
that after the lapse of some eight years the witness was un-
able to explain in all respects just how the result carried to
appellant's books was arrived at. He said that another state-
ment, in his judgment, was made than the one exhibited in
evidence containing the final work. It seems quite plain that
reductions of the profits first worked out were made for some
reason, consistent with the theory that the entire fund was
treated under the contract of March 31, 1890. We are un-
able to perceive in the evidence, even by conjecture, that it
was not so treated.

The feature of the case last discussed shows the prejudicial
character of allowing the complaint to be amended after the
lapse of many years after the death of the only party to the
transaction with Scott in respect to whether the payment of
$6,428 was received as a payment out of the fund derived
from the mortgaged property, entirely changing the situa-
tion, as both Scott and appellant understood the same to be
at the time the action was commenced.

The following satisfactorily indicates that the mortgaged
lumber was treated as we have suggested and that the pay-
ment to Scott came therefrom. The price of all the lumber
to appellant as per contract, including lumber from the mort-
gaged logs, was $38,777.23. The net amount received there-

from by appellant was $49,026.83, indicating a profit of
$10,249.60, or $5,124.80 to each party. The statement in
the record of the settlement between appellant and Kathan
is to that effect. The account upon the books as closed, evi-
dently to the satisfaction of Kathan, does not contain any
charge identical with such a division of profits. The ledger
accounts show that the entire proceeds of the lumber were
credited to Kathan. That necessarily, in effect, placed the
entire profit of the lumber deal to his credit, consistent with
the theory that the matter was by mutual understanding
worked out under the contract of March 31, 1890. The pro-
ceeds of the lumber having been credited to Kathan, placing
to his credit the entire profits, treating the contract mentioned
as conveying all the lumber to appellant in order to transfer
its portion of the profit to the credit of its profit and loss ac-
count, it became necessary, one would say, to charge Kathan
with the amount of such profits and to give a proper credit.
Kathan's ledger account on appellant's books shows that such
a charge was made, and presumably such a credit was given.
The item, however, is $4,595.60, or $529.20 short of one half
the profits as per the statement before referred to. The
figures may well have been arrived at by some treatment of
interest items, or insurance items, or other matters in the
statement which the bookkeeper testified he thought was made
other than that put in evidence. We are unable to even con-
jecture any way in which the mortgaged lumber could have
been treated in the new statement so as to reach such result.

Thus we have seen, it appears, that the $6,428 paid Scott
was not profits of the lumber deal between Kathan and ap-
pellant, for there was no such amount of profits. It repre-
sented his profits, undoubtedly, aside from overpayments
theretofore made anticipating profits, and also all there was
understood between the parties to be coming to him out of the
proceeds of the entire stock of lumber sold out of the mill-
yard. The amount is so charged to Kathan on the books. In-

stead of the memorandum explaining such charge indicating
that it was paid specifically as profits, it indicates that it was
paid just as we have suggested.   Here is the memorandum:

"To check No. 7,179 for draft to W. A. Scott per J. E. K.
order, being K.'s profits and sale of his own lumber to
H. Whitbeck & Co.   $6,428."

There can be no mistaking the meaning of that language.
It voices this: The payment was made as a closing up of all
claims of Kathan, both as to profits on the lumber deal be-
tween him and appellant and as to any lumber in the Whit-
beck & Co. deal not strictly within the terms of the contract
of March 31, 1890.   It was made out of the general fund de-
rived from all the lumber, and to close out Kathan's entire
interest in the fund.   That is in harmony with his evidence
and all the evidence in the case.   He said that the lumber
from the Scott logs was not treated separately from the logs
specifically mentioned in the contract of March 31, 1890;
and that he was authorized by Scott to let it go in with the
rest.   The latter admitted that in his evidence, but said he
consented to the sale relying on information from Kathan
which was false; that only 420,000 feet were in the millyard.
But let that be as it may, there is no escaping the conclusion
that the $6,428 was paid as a closing with other payments,
for moneys in appellant's hands, whether representing profits
on lumber or proceeds of the lumber belonging to Kathan,
sold to Whitbeck & Co.   The payment, in the state of the ac-
count as it existed when it was made, after crediting the pro-
ceeds of the lumber, brought such account substantially to a
balance.   Two debit items of small amounts, with the charge
for appellant's profits, balanced the account.   Since Kathan's
one-half of the actual profits of the lumber deal was but
$4,596.60, and the proceeds of the mortgaged lumber, accord-
ing to the findings of the court, were $14,082.15, it must be
that Kathan received all his profits on the logs specifically
covered by the contract of March 31, 1890, in advance.   Here

is the account as it was closed, putting all the debit items up to the date of the charge on account of the check in question into one sum:

| | | | | |
|---|---|---|---|---|
| Aggregate debit items, as indicated....... | $38,183 | 97 | | |
| Feb. 9.  To check No. 7,179 for draft to W. A. Scott per J. E. K. order, being K's profits and sale of his own lumber to H. Whitbeck Co...................... | 6,428 | | | |
| Feb. 17.  To check to Milroy............ | 150 | | | |
| Sept. 17.  To cash...................... | 20 | | | |
| 1892. Dec. 31.  To profit and loss............. | 4,595 | 60 | | |
| By proceeds of lumber.................. | | | $49,042 | 27 |
| By insurance returned.................. | | | 335 | 30 |
| | $49,377 | 57 | $49,377 | 57 |
| Withdrawing from the debit side of the account the check of................. | 6,428 | | | |
| And from the credit side the proceeds of the mortgaged lumber................ | | | 14,082 | 15 |
| We have this result................... | $42,945 | 57 | $35,295 | 42 |

We have a debit balance against Kathan of $7,654.15. Can there be any mistaking that the comprehensive memorandum of the charge respecting the $6,428 was made to indicate that it covered the balance going to Kathan, whether of profits or for any lumber of his own included in the credit of the proceeds received from the Whitbeck Company; that with the mortgaged lumber out of the deal, Kathan received all his profits under the contract of March 31, 1890, in advance; that he had, before the sale to Whitbeck & Co., received all the proceeds of the logs specifically mentioned in such contract at the rates therein mentioned for the manufactured products, and the profits finally obtained out of the deal as well. If not, then the payment of $6,428 cannot be legiti-

mately referred to any other source than the fund produced from the mortgaged logs,—not referred to anything else either in fact or from any indication upon appellant's books.

But it is said that when the check was sent to Scott it was accompanied by a letter from appellant to the effect that it represented the amount due Kathan under the conditions of a certain contract, the same being directed to be turned over to Scott, and that he had a right, in view of such letter, to regard the payment as not coming out of the mortgaged logs, as they were not in the contract of March 31, 1890. This effectually answers that: The account was worked out between Kathan and appellant in the process of accounting between them by putting all of the proceeds of the lumber into a common fund. The letter was not intended to indicate that the money was paid out of the fund derived from the logs, other than the mortgaged logs. Scott, in view of all the facts, had no reason to otherwise understand it, because, so far as appears, he had no knowledge but that all the Kathan logs were covered by the contract of March 31, 1890. Again, he knew that all the lumber in the yard was to be sold for account of appellant, as between it and Kathan, that some 420,000 feet of the lumber at least came from his mortgaged logs, and with such knowledge he consented to have his interest therein sold with the rest and to rely upon an order from Kathan authorizing payment to him of whatever might be found due the latter from appellant, and that the draft was sent to him accordingly. Thus his conduct leaves no doubt that he knew some of the lumber in the Buttrick yard was produced from the mortgaged logs, that he expected the same to be handled, as between Kathan and appellant, as part of the general stock, that he expected his interests would be protected as the person primarily interested in the mortgaged lumber by a payment upon the Kathan order, and that the payment was made accordingly. True, he testified that he consented to the lumber being handled that way, relying upon representations made by Kathan that there were only about 420,000

feet in which he was interested, expecting that the proceeds thereof would be paid to him. But he knew such proceeds were to go through the hands of appellant under its arrangement with Kathan, whatever such arrangement was, and were to come out on the order. He testified on the trial to this effect:

"I knew before the sale that there was lumber in the Buttrick yard that came from the mortgaged logs. I knew of the sale and was satisfied with it. I knew that the purchase money was to be paid to the *Alexander Stewart Lumber Company*. I found no fault with that. I got an order from Kathan on the company. *I got it before the lumber was sold. I got it to protect my right and delivered it to the company. When I got the order I did not know that Kathan would sell the lumber. The Stewart Lumber Company sold the lumber.*"

That means this, if anything: Scott knew that some of the mortgaged lumber was piled in the Buttrick yard; that the sale thereof was to be controlled by appellant; that it was to be sold as part of its stock of lumber in the Buttrick yard; that he was willing to have the lumber so sold in view of the fact that the proceeds would come to the possession, for him, of a responsible party, the *Alexander Stewart Lumber Company,* and that he had an order on file with such company to protect his rights. So when he got the draft, obviously he understood it was sent pursuant to the order; *that it was given in protection of his rights. He had no property rights to be protected except by virtue of his mortgage.*

Scott's conduct after he got the check is consistent with the view above expressed. Soon thereafter he made complaint to appellant that the amount he had received was not in full for his proportion of the proceeds of the sale of the lumber; that the amount of the mortgaged lumber included in the sale was greater than had been represented to him. He testified on this as follows:

"I objected to the division of the proceeds of the sale on the ground that it was represented to me that there were over 400,000 feet of logs sawed that were under the mortgage.

I had not been allowed that, and I asked the reason. He [meaning an officer of appellant] claimed that the statement was all right and that I had all I could claim under the sale."

What statement was all right? Manifestly the statement showing that the proceeds of all the lumber went into a common fund, introduced in evidence. There can be no mistaking the meaning of that testimony. Scott understood that the $6,428 came out of the common fund, the proceeds of the mortgaged and unmortgaged lumber. He believed that more should be paid him because such sum was disproportionate to the amount of mortgaged logs that had been manufactured. Later, when this action was commenced, consistent with that theory, the admission was made in the complaint that the payment under discussion was on account of the mortgaged property, and that admission remained without an intimation, as before stated, that it was not in accordance with the facts, until Mr. Kathan died. Without stopping to discuss this phase of the case further, it is evident that when this action was commenced, and for some eight years thereafter, it was Scott's idea and that of his attorney, as well as the understanding of all parties concerned, that the $6,428 payment was made, so far at least as appellant was concerned, out of the proceeds of the mortgaged lumber and to apply on the mortgage indebtedness, and that they were possessed of a written statement from appellant's office in harmony with that view.

The conclusion is that the $6,428 was paid out of the proceeds of the mortgaged lumber if the amount thereof was as found by the trial court, and in respect to that we see no good reason for disturbing the court's findings. It was intended to be applied on account of the claim which Scott had on the lumber sold to Whitbeck & Co., and it was so received by Scott. Now it is quite immaterial to this case what application was made of the money as between Scott and Kathan. The principle is elementary that the proceeds of mortgaged

property must be applied to extinguish the mortgage indebtedness regardless of any agreement between mortgagor and mortgagee, so far as the rights of innocent third persons would otherwise be prejudicially affected. Jones, Chattel Mortgages, § 640. Scott's interest in the fund received by appellant from Whitbeck & Co. cannot exceed the amount of such proceeds or the amount due upon the mortgage indebtedness left after deducting therefrom all sums upon the mortgage security, being the $6,428 received from appellant February 10, 1891, $3,748.09 received from logs and lumber March 23, 1892, and $197.80 received August 2, 1892.

The point is made on exceptions that Scott gave his agent, Kathan, authority to sell the mortgaged lumber, and therefore that he cannot pursue appellant, who acted in good faith in joining with Kathan and selling the lumber and in disposing of the proceeds. The trouble with that position is that the court found that Scott consented only to a sale of the lumber which he was informed was piled separately in the millyard amounting to 420,000 feet; that appellant consented to Kathan's wrongdoing in confusing about 1,200,000 feet of mortgaged lumber with lumber not affected by the mortgage; that it profited thereby, by joining, with knowledge of the facts, in selling the stock as unaffected by the mortgage, except as to 420,000 feet, and receiving and appropriating the proceeds thereof to his own use. There is evidence in the record to support that view,—evidence so strong that under the rules applicable to the subject we cannot properly overrule the circuit judge's conclusions. There is evidence tending to show that, whereas 1,656,724 feet of lumber was manufactured from the mortgaged logs, appellant knew that all but 420,000 feet thereof was confused with its lumber, while Kathan was, by his conduct at least, giving out to Scott that the lumber manufactured from the mortgaged logs was but the small amount of 420,000 feet piled separate and marked as such. Assuming, as we must, that the facts which such

evidence tends to prove exist as found by the trial court, it cannot be properly said that Scott consented to the sale of any mortgaged lumber except the 420,000 feet, or that appellant was an innocent party in joining in a sale of some 1,200,000 feet of other mortgaged lumber and receiving the proceeds thereof and treating the same regardless of the mortgagee's rights. Since appellant was a guilty participant with Kathan as above indicated, it became liable to Scott for money had and received to the extent necessary to satisfy plaintiff's claim, subject to the rule heretofore stated, that such claim can be considered only as being the amount of the mortgage indebtedness according to the terms of the $10,000 note evidencing the same, after applying thereon all the sums received out of the mortgaged property as before indicated.

There are many other questions discussed in the briefs of counsel, but it is believed that such of them as are material to the disposition of this case are included in the points that have been discussed and decided.

The result is that the judgment appealed from must be reversed and the cause remanded to the trial court with directions to render judgment in favor of plaintiff in accordance with this opinion. The $6,428, the $3,748.09 and the $197.80 must be applied on the mortgage indebtedness as received, and judgment be rendered for the balance with costs as heretofore taxed and allowed.

*By the Court.*—So ordered.

A motion for a rehearing was denied September 29, 1903.